H. H. Winer and Margaret Winer v. Commissioner. H. H. Winer v. Commissioner.
Winer v. Commissioner
Docket Nos. 38793, 38794.
United States Tax Court
T.C. Memo 1954-148; 1954 Tax Ct. Memo LEXIS 97; 13 T.C.M. (CCH) 858; T.C.M. (RIA) 54254; September 10, 1954, Filed *97 Petitioners operated a scrap business. Their books did not clearly reflect income and respondent determined their net income by the net worth increase method. He also determined additions to tax under section 293(b), I.R.C. Held, petitioners' testimony that they possessed a large cash hoard at the beginning of 1945 is not believed, and with two adjustments the determination of the deficiencies by respondent is upheld. Further, held, the evidence is clear and convincing that net income was substantially understated for each of the years 1945, 1946, 1947, and 1948 and that part of the deficiencies in each of those years was due to fraud with intent to evade taxes. Fred M. Williams, Jr., Esq., 826 Cherry Street, Chattanooga, *98 Tenn, for the petitioners. Frederick T. Carney, Esq., and S. Earl Heilman, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax and additions to tax under section 293(b) of the Internal Revenue Code of 1939, as follows: H. H. Winer and Margaret Winer,
Docket No. 38793
Additions to tax
Year
Deficiency
under Sec. 293(b)
1948
$9,384.98
$4,231.83
1949
275.00
137.50
H. H. Winer, Docket No. 38794
1945
$2,733.98
$1,366.99
1946
3,616.29
1,808.15
1947
4,239.98
1,422.02
The proceedings were consolidated for hearing. The principal issues are whether respondent was justified in using the net worth increase method to determine petitioners' net income, whether petitioners' net income exceeded the amount reported, and whether there were deficiencies due in part to fraud with intent to evade income taxes. Findings of Fact The stipulated facts are so found. Harry W. Winer (hereinafter referred to as Harry) and Margaret L. Winer (hereinafter referred to as Margaret) are husband and wife residing in Chattanooga, Tennessee. They filed their income *99 tax returns for the years involved with the collector of internal revenue for the district of Tennessee. They prepared their returns on a cash basis. Harry was born around 1906. In 1917 and 1918 during World War I he sold souvenirs at Army camps near Chattanooga. Harry quit school in 1925 or 1926 and went to work for his father who operated a scrap metal business in Chattanooga known as the American Iron and Metal Company. Harry lived at home. In addition to his room and board he received approximately $25 per week during the 1920's, virtually nothing during the depression years, and $40 to $50 per week around 1940. Harry did not file an income tax return prior to 1940. In 1940, 1942, and 1943 he reported and paid the tax on a net income of less than $2,000. In 1941 and 1944 he reported and paid the tax on a net income of less than $3,000. On June 4, 1937 Harry borrowed $150 to be repaid in 10 monthly installments of $15 each. The loan was secured by a 1936 Plymouth automobile. He borrowed $205.20 on December 21, 1938 to be repaid in 12 monthly installments of $17.10 each. The latter loan was secured by the same automobile. Harry and Margaret were married in December 1941. At *100 that time Margaret was 21 years of age. She had worked as a waitress for three years prior to their marriage earning from $35 to $40 per week. She had some cash savings but no bonds or bank accounts at the time of her marriage. After their marriage until 1946 when they purchased a house, Harry and Margaret lived in one room in the home of Harry's father. Margaret worked in the business with Harry beginning in 1942. In 1945 she was given the right to write checks on the firm's checking account. Harry's father was injured in 1940. Thereafter Harry managed the business. Harry's father died in November 1944 leaving a will devising and bequeathing the business to Harry. Throughout the taxable years involved Harry was the owner and manager of the American Iron and Metal Company. Prior to 1945 Harry drank alcoholic beverages to excess and gambled to a considerable extent. He lost more gambling than he won. On December 30, 1943 Margaret opened a saving account in the American Trust & Banking Co., Chattanooga, Tennessee. She opened the account in her maiden name and gave her mother's post office box in Chickamauga, Georgia, as her address. During 1944 she made deposits in the account *101 as large as $2,125 and she also made five substantial withdrawals. On January 1, 1945, the balance in the account was $5,311.86. Margaret also purchased approximately $2,000 worth of Government bonds in 1942 which she gave to her mother for safe keeping. On the advice of an accountant who prepared Harry's tax returns, Harry personally maintained four single entry journals consisting of a yard expenses journal, a labor journal, a sales journal, and a purchases journal, which comprised the books of his business. The above-named journals contained errors in footings. Some of the errors were substantial and for the most part diminished the amount of taxable income. The yard expenses journal contained payments for capital items which should have been capitalized and contained expenses which were not properly deductible. Harry's income tax returns for the years 1945, 1946, and 1947 and the joint returns of Harry and Margaret for the years 1948 and 1949 were prepared by an accountant on the basis of these journals. The correct totals of the items represented as sales, purchases, labor expenses, and yard expenses in the four journals are as follows: Yard Expenses
Year
Sales Journal
Purchases Journal
Labor Journal
Journal
1945
$ 35,693.13
$ 27,351.12
$4,486.30
$3,039.93
1946
58,898.95
47,809.78
4,008.00
2,670.15
1947
92,504.10
73,279.70
6,127.60
3,582.11
1948
150,408.42
116,967.04
8,627.64
6,567.02
1949
21,970.31
28,311.47
3,478.90
2,590.40
*102 Harry retained little or no supporting data to substantiate the entries in the various journals. A number of sales were not entered in the sales journal. In each of the years involved the income of the business substantially exceeded the amount reflected by the books. The books do not clearly reflect income. Petitioners' assets and liabilities, upon the basis of which net income for the years in question is computed by the net worth increase method, are as follows: ASSETS AND LIABILITIES OF H. H. WINER AND MARGARET WINER, 1945-1949
ASSETS
12-31-44
12-31-45
12-31-46
12-31-47
12-31-48
12-31-49
Checking account of American
Iron & Metal Co: Highland Park Branch,
Hamilton Natl. Bk.
$ (30.34)
$ 988.01
$ 347.37
$ 579.07
$ 1,247.35
$ 594.34
Undeposited sales checks:
2,123.70
Savings accounts in Margaret
Winer's married and maiden
names: Amer. Tr. & Banking Co.,
Chattanooga, Tenn.
5,311.86
8,341.57
4,437.98
9,934.85
10,451.06
2,397.57
First Fed. Sav. & Loan
Assn., Chattanooga, Tenn.
3,523.24
3,611.87
5,102.72
5,213.36
5,344.50
Chattanooga Fed. Sav. &
Loan Assn., Chattanooga,
Tenn.
5,747.50
5,892.08
Fulton County Fed. Sav. &
Loan Assn., Atlanta, Ga.
5,012.50
5,164.01
Standard Fed. Sav. & Loan
Assn., Atlanta, Ga.
5,400.00
5,508.40
Home Bldg. & Loan Assn.,
Atlanta, Ga.
4,533.75
4,670.74
Atlanta Fed. Sav. & Loan
Assn., Atlanta, Ga.
5,250.00
5,368.70
Accounts receivable:
3,000.00
1,500.00
Cashier's checks:
2,000.00
2,000.00
Series E War Bonds (at cost):
4,106.25
4,106.25
4,106.25
4,106.25
4,106.25
4,106.25
Investors Syndicate: Certificate 51-71153 $2,000
56.20
168.60
281.00
393.40
449.60
Certificate 10-507352 5,000
241.70
468.40
Certificate 10-507353 5,000
234.50
461.20
Autos and Trucks: 1939 Ford Coach
500.00
500.00
500.00
1 1/2 Ton Ford Truck
1,583.72
1,583.72
1,583.72
1,583.72
1,583.72
1947 Buick Super Sedanette
2,353.08
1946 Ford Coupe
1,800.00
1,800.00
1,800.00
1 1/2 Ton Ford Truck
3,000.00
3,000.00
1949 Buick Super Convertible
100.00
3,112.94
Yard and Office Equipment:
239.11
308.23
1,214.48
1,482.83
1,482.83
Real Estate: 801 Clayton Ave., Crestwood
10,000.00
10,000.00
10,000.00
10,000.00
Lot 23, Crestwood
850.00
850.00
Diamond Ring
750.00
1,450.00
1,450.00
1,450.00
1,450.00
Diamond Watch
850.00
850.00
850.00
TOTAL ASSETS
$ 9,887.77
$20,088.10
$30,637.72
$42,255.17
$72,447.92
$64,555.29
LIABILITIES
Loans: Hamilton Natl. Bk., High-
land Park Branch
$ 496.67
$ 497.00
$ 2,965.00
Pioneer Bank
$ 3,600.00
Amer. Tr. & Banking Co.
$ 1,062.50
216.50
Reserve for depreciation:
34.06
373.47
742.19
$ 1,595.30
2,604.70
TOTAL LIABILITIES
$ 496.67
$ 1,096.56
$ 4,189.97
$ 1,239.19
$ 1,595.30
$ 5,569.70
*103 Petitioners' net worth increased by $9,600.44, $7,456.21, $14,568.23, and $29,836.64 in the years 1945, 1946, 1947, and 1948, respectively. It decreased by $11,867.03 in 1949. The amounts of $2,864.38, $4,613.42, $6,860.86, and $8,268.08 are to be added to the amounts of net worth increase for the years 1945, 1946, 1947, and 1948, respectively, in order to reflect personal expenditures plus one-half of capital gains realized, less money received by gift or inheritance, in order to determine net income. The amount of $6,968.12 is to be subtracted from the net worth decrease in 1949 to reflect personal expenditures, in determining the amount of net loss for that year. Based upon these figures Harry's net income for 1945, 1946, and 1947 was $12,464.82, $12,069.63, and $21,429.09, respectively. Petitioners' joint income for 1948 was $38,104.72 and their net loss in 1949 was $4,898.91. Approximately the same result is reached computing petitioners' net income or loss for the years involved by the bank deposits-expenditures method. Harry filed individual income tax returns for the years 1945, 1946, and 1947 and reported net income in the amounts of $983.23, $4,735.15, and $7,864.73, *104 respectively. Harry and Margaret filed joint returns for the years 1948 and 1949 and reported a net income of $12,588 in 1948 and a net loss of $12,372 in 1949. Taxes of $12.00, $642.00, $1,395.95, $1,586.64, and $1,800.00 were assessed for the years 1945, 1946, 1947, 1948, and 1949, respectively, of which $1,395.95 and $921.32 of the respective amounts assessed in 1947 and 1948 were refunded. At least part of the deficiency for each of the years 1945 through 1948 is due to fraud with intent to evade tax. Harry filed a false or fraudulent return in 1946 with intent to evade tax. Opinion Petitioner Harry H. Winer pleads that the statute of limitations bars an additional assessment for the year 1946. But, as we have found that he filed a false or fraudulent return for that year with intent to evade tax, pursuant to section 276(a) of the Internal Revenue Code of 1939, "the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." The books of the American Iron and Metal Company contained substantial errors in footings, included personal and capital items as expenses, did not include certain sales, and substantially *105 understated the income of the business. They do not clearly reflect income and respondent justifiably resorted to the net worth increase method to determine petitioners' income upon the basis of which he computed the deficiencies. The deficiencies so determined by respondent are prima facie correct. Frank Imburgia, 22 T.C. - (filed August 5, 1954). Similar to many cases of this type, the principal dispute concerns the amount of beginning cash. Petitioners contend that they possessed approximately $45,000 in cash at the beginning of 1945, including $5,311.86 in a savings account in Margaret's maiden name. Respondent admits that the above sum was in the savings account and we have made appropriate adjustments in the net worth increase for each of the years involved to reflect the year-end balances in this account. Respondent denies, however, that Margaret had $22,000 in coffee cans in her closet, that Margaret's mother had $12,000 which she was keeping for Margaret in a can in her home, and that Harry had $3,000 to $5,000 in his pocket or in the office safe. Petitioners rely solely upon their own testimony and the testimony of Margaret's mother to establish the existence of the cash *106 hoard. They contend that around 1940 Harry had $25,000 in a safety deposit box in Knoxville, Tennessee, and another $25,000 in the office safe. Margaret stated that an admirer had given her approximately $10,000 and she earned an additional $500 making quilts. Margaret allegedly gave the money to her mother for safe keeping. Margaret testified that after her marriage Harry gave her $12,000 and that later in 1942, due to his heavy drinking, he gave her an additional $22,000. The $12,000 she stated was turned over to her mother, who put it in a cloth sack and pinned it to her person. Margaret contends that she kept the $22,000 in coffee cans in the closet of the room which she and Harry occupied. Margaret opened a savings account in 1943 and purchased Government bonds allegedly with the money acquired prior to her marriage. She opened another savings account in 1945 and five more in 1948, allegedly with the $34,000 which she contends Harry gave to her in 1942. We find petitioners' testimony conflicting and vital portions of their implausible story contradicted by known facts. Harry contends that he had accumulated $50,000 by 1940. But he was forced to borrow $150 in 1937 and $205.20 *107 in 1938. Both loans were repayable in small monthly installments. When pressed for an explanation as to how he had accumulated such a large amount of cash, he stated that he had won most of the money gambling. He had previously testified that he had lost more gambling than he won. He stated that he kept $25,000 in cash in a safety deposit box in Knoxville and the other $25,000 in Chattanooga, but the safety deposit box was not rented until March 19, 1941. He further testified that out of the $25,000 in Chattanooga he gave $34,000 to his wife and had nearly $10,000 left over. When asked to explain this manifest impossibility, he offered the excuse that he could not remember amounts involved that long ago right to the penny. We find Margaret's testimony equally unbelievable. Her frequent withdrawals from the savings account prior to 1945 is inconsistent with her testimony that she had $22,000 in cash at home. Her testimony with regard to hiding $22,000 in coffee cans in the closet for several years without Harry knowing about it was not only implausible but was extremely vague and was riddled with contradictions. She did not state where the money was hidden from the time she moved *108 into the new house in 1946 until 1948 when she allegedly deposited the money in various savings accounts. Margaret testified at one point that she retrieved the $12,000 which her mother was holding at the end of 1942. What happened to this money from that time on is not explained. Also, Margaret's testimony, especially her contention that a Mr. Rice had given her $10,000 prior to her marriage, is directly contrary to her statement to the revenue agent that she had never received any money by gift or inheritance. Petitioners rely heavily upon the testimony of Margaret's mother. But her testimony, which was obviously biased, would need only a few changes to agree substantially with the conceded facts. Margaret had approximately $7,400 in Government bonds and in a savings account at the beginning of 1945. It is quite possible that in prior years Margaret had given her mother substantial amounts of cash for safe keeping. However, we do not believe the statement that the money was not returned to Margaret until 1945. Nor do we believe that Margaret's mother had as much as $12,000 in her possession at any one time. In addition to the $12,000, Margaret's mother allegedly saw another large *109 sum of money in Margaret's possession; but she did not count it and was confused as to whether the amount thereof was supposed to be $2,200 or $22,000. If she did see a large sum as she contends, it was probably the $2,125 which Margaret deposited in her savings account on June 2, 1944. In addition to the cash hoard, the existence of which petitioners have failed to prove, petitioners contend that Harry inherited from his father a $12,000 to $15,000 inventory and equipment worth $2,500 which respondent erroneously did not include in his beginning net worth. This contention is in conflict with Harry's 1945 income tax return which states that he had no inventory on January 1, 1945 and contains no claim for depreciation on any of the items of equipment mentioned. Furthermore, Harry stated to the agents checking his returns that the yard was always depleted of scrap at the beginning of each of the years involved. But even if Harry had a substantial inventory at the beginning of 1945, there is no proof that his inventory was not equally as large at the end of that year and at the end of each of the ensuing years. In 1949 Harry's books show that purchases exceeded sales by $6,341.16, and *110 he undoubtedly had a large inventory at the end of that year. Also there is no showing that Harry did not retain the equipment mentioned in his testimony throughout the years involved, and petitioners do not contend that respondent's deductions for depreciation were too small. Unless the inventory was reduced or the equipment was sold it would not diminish the amount of petitioners' income as computed by the net worth increase method. Harry also testified that in 1945 he received a cash distribution from his father's estate. His estimate of the amount received varied between $1,500 and $1,800. Upon the basis of his uncontradicted testimony we have found that he received at least $1,500, and we have deducted that amount from his personal expenditures for the year 1945 in order to compensate therefor. Petitioners have failed to prove that respondent's computation of their net income for the years involved by means of the net worth increase method was erroneous with only two exceptions, viz.: respondent's failure to make adjustments for Margaret's savings account in the American Trust & Banking Co. (the existence of which was not discovered by respondent until approximately two weeks *111 before the hearing herein) and his failure to make allowance for Harry's inheritance. Therefore, with adjustments for these two items, the deficiencies as determined by respondent are sustained. Respondent contends that some part of the deficiencies determined for each of the taxable years involved was due to fraud with intent to evade tax within the purview of section 293(b) of the Internal Revenue Code of 1939, and has accordingly determined 50 per cent additions to tax for each of those years. Respondent has the burden of establishing his contention by clear and convincing evidence. Frank Imburgia, supra. Although of necessity respondent has relied upon circumstantial evidence, we think the record demonstrates the validity of his contention. In our opinion the proof affirmatively shows that Harry substantially understated his net income in 1945, 1946, and 1947, and that petitioners substantially understated their net income in 1948 and overstated their net loss in 1949. We also think the proof shows that the understatement of net income in 1945, 1946, 1947, and 1948 was deliberate and was done with the fraudulent intent to evade tax. The fact that the petitioners, or at least *112 Harry, consistently failed to report large amounts of income is of itself evidence of fraud. Also suspicious is the fact that the bulk of their assets consisted of savings deposits in Margaret's name, the majority of which were in out-of-town banks. But the most persuasive evidence of fraud was Harry's attempt to conceal the existence of these accounts. He denied their existence when questioned about such accounts and did not include them on a net worth statement which was subscribed and sworn to by him. Seeking to excuse his conduct, Harry testified that he knew nothing of the accounts until they were discovered by the agents investigating petitioners' returns. However, the implausibility of this contention and the fact that he entered on his books as dividends the exact amount of interest earned on these accounts for the year 1949 lead us to believe that he was fully aware of the existence of the accounts from their inception. The fact that the accounts were in Margaret's name, who did not mention them when questioned by the agents, clearly indicates that she was a party to the fraud. Also, she was active in the business and was not a wife who knew nothing of her husband's affairs. *113 There are numerous other indications of fraud in the record in addition to those already mentioned, and we think there is ample evidence to sustain respondent's imposition of an addition to tax under section 293(b) for each of the years 1945, 1946, 1947, and 1948. The additions to tax shall be computed upon the basis of the original deficiencies for those years without reduction for the net loss carry-back from 1949. P.C. and Ethel Petterson, 19 T.C. 486; Auerbach Shoe Co., 21 T.C. 191, (on appeal C.A. 1). Of course, as petitioners sustained a net loss in 1949, there is no deficiency and no addition to tax on account of fraud can be imposed for that year. Decisions will be entered under Rule 50.